# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

JOHN PETRONZI,        )
                    )     Civil Action No:
        *Plaintiff,*      )    15-cv-3593 (PGS)(TJB)
                    )
     v.               )
                    )     **MEMORANDUM**
COMPUTER SCIENCES CORPORATION and  )     **AND**
SCOTT WARKENTIN      )     **ORDER**
                    )
       *Defendants.*    )
                    )
                    )

This matter comes before the Court on Defendants Computer Sciences Corporation and Scott Warkentin's Motion for Summary Judgment (ECF No. 34). In his Complaint, Plaintiff John Petronzi alleges that Defendants wrongfully terminated him due to his age, disability, and filing a grievance, in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. § 10:5-1. He also claims that Warkentin violated the LAD by aiding and abetting this unlawful conduct. Lastly, Plaintiff's Complaint alleges claims of breach of contract and breach of the covenant of good faith and fair dealing, based on an incentive program initiated by Computer Sciences. For the reasons discussed herein, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## BACKGROUND

Computer Sciences is a global provider of information technology and offers professional services and solutions to corporate clients. (Defs' Statement of Material Facts [DSOMF] at ¶ 2). In July 2007, Plaintiff, who is now 68 years old, was hired as an at-will employee by Computer Sciences. (*Id.* at ¶¶ 9-10). For the bulk of his tenure at Computer Sciences, Plaintiff served as a Client Relationship Executive (hereinafter, "CRE") in the Financial Services Group, which later

became the Banking & Capital Markets Industry Group. (*Id.* at ¶ 11). As a CRE, Plaintiff was responsible for managing and growing the revenue and profits of various client accounts. Essentially, Plaintiff was a sales person. (*Id.* at ¶¶ 12-13). In order to generate revenue, Computer Sciences assigned Plaintiff, as well as other CREs, a certain quota for account revenue and new contract signings, which the company referred to as Total Contract Value (hereinafter, "Sales Quota"). (*Id.* at ¶ 13).

As a sales professional, Plaintiff was eligible to participate in Computer Science's "Sales Incentive Compensation Plan" (hereinafter, "Incentive Plan"), which awarded bonuses to sales employees who exceeded certain goals. (*Id.* at ¶ 103). Under the Incentive Plan, each participant had an individual Plan Assignment Agreement which described the participant's "territory" and "services", and the credit that each participant would receive towards his or her bonus. (*Id.* at ¶ 107). If an account was not identified in the participant's Plan Assignment Agreement, he or she would not receive credit for work performed on it. (*Id.* at ¶ 109). Under Sections 7.1 and 7.2 of the Incentive Plan, Computer Sciences reserved itself with discretion on how to interpret and execute the incentive plan:

> 7.1     [Computer Sciences] has complete discretion and final authority to administer and interpret this Plan and to resolve any disputes concerning its administration or interpretation.
>
> 7.2     [Computer Sciences] reserves the right to assign or reassign Opportunities at any time among [Incentive Plan] Participants as business conditions warrant. In the event the [Incentive Plan] Participant is reassigned from an Opportunity prior to a Contract Award, [Computer Sciences] may, in its discretion, grant partial or total quota credit to the [Incentive Plan] Participants to reflect his/her contribution to such Contract Award.

(ECF No. 34-19, "Incentive Plan" at 6).

In August 2013, Computer Sciences rolled out a new incentive program, the Million Dollar Challenge, that offered bonuses for employees that surpassed certain goals on accounts listed in

the Plan Assignment Agreement. (*Id.* at ¶ 114). Later that month, Computer Sciences emailed all eligible participants about this new incentive, which stated that eligible employees who "achieve $1M (million) in [fiscal year 2014] revenue above the full-year forecast" are eligible for $15,000 for the first $1 million in revenue and an additional 1.5% bonus for every additional dollar above the initial million. (ECF No. 34-24, "Million Dollar Challenge Email").

During this period, UBS, one of Plaintiff's accounts, exceeded forecasted revenues for that Fiscal Year, which would have entitled participants in the account, such as Plaintiff, to a potential bonus. (*Id.* at ¶ 115). However, because the UBS account was "seriously underperforming," no CRE received the Million Dollar Challenge incentive on the UBS account. (*Id.* at ¶ 116). According to Computer Sciences, executive leadership cited the UBS account team's history of underperforming, the account's substantial net negative revenue, and major customer satisfaction issues, as reasons for declining to award the incentive. (*Id.* at ¶¶ 116-18).

On January 19, 2014, Plaintiff suffered a heart attack and did not attend work for about seven business days. (*Id.* at ¶¶ 85-86). However, Plaintiff did not experience any lingering health issues or restrictions as a result, nor did he apply for disability benefits thereafter. (*Id.* at ¶¶ 86, 88). This being said, at 65 years old, Plaintiff claims that Computer Sciences made a series of employment decisions and account reassignments to Plaintiff's detriment, to ultimately justify his termination the following year.

In April 2014, Plaintiff was removed from the UBS account and reassigned four "New Logo" accounts, which are new accounts with companies that had not previously conducted business with Computer Sciences. (Pl's Statement of Material Facts [PSOMF] at ¶¶ 39, 47-48). According to Computer Sciences, Plaintiff was removed from the UBS account due to a "lack of results," despite the fact that the account had surpassed revenue projections the year before. (*Id.* at

¶ 40). Rather than appoint another CRE to the UBS account, Computer Sciences eliminated the CRE role altogether and, instead, assigned Tamara Kostova to serve as the global manager of the account. (DSMOF at ¶ 33). At the time, Kostova was 38 years old, 27 years younger than Plaintiff. (PSMOF at ¶ 45).

That same month, Defendant Scott Warkentin was hired by Computer Sciences to oversee operation the Banking & Capital Markets Group. (*Id.* at ¶¶ 44-45). As part of his hiring, Warkentin was responsible for reorganizing the group, improving the overall performance of the firm, and increasing sales and revenue. (*Id.* at ¶ 46). Specifically, Warkentin assessed the performances of Computer Sciences' sales employees, including Plaintiff. (*Id.* at ¶¶ 47-48).

The parties disagree about Plaintiff's performance. According to Defendants, Plaintiff was not performing up to expectations; with the exception of UBS, Plaintiff failed to generate revenue on any of his other accounts. (*Id.* at ¶ 25). As such, John Wallace, Plaintiff's former supervisor, noted in his assessment of Plaintiff that "[he] needed to prove himself within 90 days." (*Id.* at ¶ 49). Plaintiff, however, relies on Wallace's Fiscal Year 2014 Performance Appraisal of Plaintiff, which purportedly expressed positive views of Plaintiff's performance. (ECF No. 45-5 at 36-43, "FY 2014 Appraisal"). In this appraisal, Wallace noted that, "[Plaintiff] worked diligently and effectively to sustain the relationship with UBS despite significant headwinds caused by [Computer Science's] delivery performance issues and with underlying contract issues." (*Id.* at 3). However, in his overall appraisal comments, Wallace also acknowledged that Plaintiff did not generate much revenue besides his UBS account; as such, Wallace concluded:

> [Plaintiff's] #1 objective in FY2015 is to leverage the foundation of executive relationships he built and strengthened in FY2014. He must executive [sic] against a series of well thought out account plans and opportunity development and close plans to deliver substantial new business results to meet or exceed his targets and make material contributions to the Banking and Capital Markets Industry business.

(*Id.* at 8).

Nevertheless, as part of the Banking & Capital Markets Groups' reorganization, Warkentin began reassigning CRE employees to new account teams. (DSOMF at ¶¶ 51-52). In August 2014, Plaintiff was placed on Warkentin's team, where he was seven years older than the next oldest CRE. (PSOMF at ¶ 52). As a member of Warkentin's team, Plaintiff was assigned 70 new logo accounts; the remaining CREs, however, were assigned significantly fewer accounts, the next closest being 38 new logo accounts. (*Id.* at ¶¶ 52, 57). In an August 6, 2014 email, Warkentin addressed his new team and explained that the new account assignments had a retroactive start of the second quarter, July 1, 2014. (*Id.* at ¶ 51; ECF No 34-33, "August 6, 2014 Email"). The email also noted that Plaintiff and Tim Tolls, another CRE, would be assigned the majority of new logo clients. (*Id.*). According to Computer Sciences, Plaintiff was assigned these new logo accounts since he was removed from UBS and, therefore, "had the bandwidth to take on the new assignment." (*Id.* at ¶¶ 57-58). In deposition, Wallace explained why he believed Plaintiff would be suited for new logo accounts:

> The new logo accounts, many of the new logo accounts [Plaintiff] was assigned have businesses that are very similar and in some cases almost the same, as the businesses that UBS is in or the business that RBS Citizens is in or the business that Credit Suisse is in. So, he has the requisite domain expertise and experience.
>
> In addition, the quote/unquote Wall Street client is one whereby, for example, a CTO that he knew well from UBS moved and became the infrastructure CIO at Morgan Stanley and he had other relationships, for example, at Morgan Stanley which is why we made the decision to assign Morgan Stanley to him. That's the logic and decision-making Scott and I went through.

(ECF No. 34-31, "Wallace Deposition" at 99-100). Computer Sciences also viewed this reassignment as an opportunity for Plaintiff to generate greater sales revenue, since these new accounts each had "potential." (*Id.* at ¶ 61).

Plaintiff, however, viewed the new assignment as a demotion. (PSOMF at ¶¶ 55-56). From his perspective, "despite his track record of success handling established accounts, he was now being assigned the time-consuming task of developing 70 different [n]ew [l]ogo accounts." (*Id.* at ¶ 55). Moreover, according to Plaintiff, he was the only CRE on Warkentin's team to be assigned exclusively new logo accounts. (*Id.* at ¶ 56).

Despite this reassignment, Computer Sciences claims Plaintiff's work performance continued to decline. (DSOMF at ¶¶ 64-65). By late November 2014, Plaintiff had only achieved $2.57 million, or 9%, of his annual Sales Quota for the 2015 Fiscal Year; as such, Warkentin scheduled a meeting with Plaintiff, to discuss his mid-year review and performance concerns. (*Id.* at ¶¶ 64-67). Dissatisfied with his performance, Warkentin explained to Plaintiff that he would need to reach a Sales Quota of at least $10 million by the end of the third quarter or risk termination. (*Id.* at ¶¶ 68-69). Put another way, Warkentin expected Plaintiff to realize earnings of $7.5 million in less than one month. According to Plaintiff, to develop a new logo account takes anywhere from twelve to eighteen months; so for Warkentin to impose a quota that quadrupled his revenue in a single quarter was simply impossible. (PSOMF at ¶¶ 57, 61, 67). In addition, Plaintiff was told that his FY 2015 Sales Quota had increased from $12 million to $36 million. (*Id.* at ¶ 74). No other CRE's Sales Quota tripled during that time. (*Id.* at ¶ 76).

Two weeks, later, on December 4, 2014, Plaintiff emailed Warkentin, regarding his mid-year review. (*Id.* at ¶ 70). In this email, Plaintiff expressed to Warkentin that he felt the negative review was unfair and that "[t]he only explanation that makes any sense is that [Computer Sciences] is trying to force me out of the Company because of my age (65) and recent health condition to make room for younger employees." (*Id.*). In response, Warkentin directed Plaintiff to bring these allegations to the Employee Relations (ER) Department's attention. (*Id.* at ¶ 71).

The following day, December 5, 2014, Plaintiff forwarded his email communications with Warkentin to the ER Department, which initiated an internal investigation of the complaint. (*Id.* at ¶¶ 72-73). Following the investigation, an ER Specialist concluded that Plaintiff's claims were unsubstantiated. (*Id.* at ¶ 74). After speaking with management and other witnesses, the Specialist prepared a Summary Report of Investigation (hereinafter, "SRI"), which concluded:

> Regarding Age Discrimination: [the Specialist] has found that the actions taken by Mr. Warkentin as well as other members of management . . . to be fair and consistent regarding the ages, the gender, and the documented production of each member of their sales team. . . .

> Mr. Petronzi claimed he was being replaced by a "38 year old woman with no experience." [The Specialist] found that an account Mr. Petronzi was previously on was given to a female employee, 38 years old, but with substantial experience. [The Specialist] has concluded that the hiring of this employee was o[f] merit and not related to her age or gender.

> Regarding Health Discrimination: At no point during any of the conversations with Mr. Warkintin [sic] or any other management was Mr. Petronzi's health mentioned as being a factor in their decision-making. The focus of the decisions were strictly numbers (past production and sales that were in the pipeline.) When [the Specialist] mentioned the idea of Mr. Petronzi's heart condition playing a role in their decision-making process, the reactions by Mr. Warkentin and other management were of confusion and shock. [The Specialist] felt their reactions were genuine.

> Additionally, Mr. Petronzi did not produce any documentation to back up this claim.

(ECF No. 45-6 at 28, "SRI"). A week after submitting this grievance, Warkentin requested permission from ER to terminate Plaintiff's employment. (PSOMF at ¶ 108).

On February 17, 2015, Plaintiff was fired from Computer Sciences, citing poor performance. (DSOMF at ¶ 78). According to Computer Sciences, Plaintiff had only attained 10% of his assigned quota, which was in the lowest quartile of overall performance of CREs. (*Id.* at ¶¶ 78, 80). However, just two months prior to Plaintiff's termination, Computer Sciences hired Harold Westervelt, then 51, as a CRE. (PSOMF at ¶ 122). Once Plaintiff was fired, Westervelt

was assigned new logo accounts similar to the accounts Plaintiff was assigned. (*Id.* at ¶ 123). For that ensuing fiscal year, FY 2016, Westervelt was assigned a Sales Quota of $15.2 million, yet failed to generate any revenue towards his Sales Quota. (*Id.* at ¶ 124). Despite failing to meet his assigned quota, Westervelt was not fired. (*Id.* at ¶ 125).

Plaintiff claims that Computer Sciences reassigned him to new logo accounts and reassessed his quota to an insurmountable amount in order to justify terminating him for poor performance when, in reality, it was due to his age, health, and grievance. (PSOMF at ¶ 107-114).

## LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; S*iegel Transfer, Inc. v. Carrier*

*Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor...that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 F. App'x 222, 227 (3d Cir. 2007).

## ANALYSIS

### I. LAD Claims

#### *1. McDonnell Douglas Burden Shifting Framework*

Plaintiff argues that Computer Sciences and Warkentin discriminatorily fired him based on his age, disability, and his grievance with the ER Department, contrary to LAD. When, as here, there is no explicit discrimination alleged, generally one should analyze the LAD discrimination claims under the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Bergen Commercial Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999). "[T]he entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 272 (1989) (O'Connor, J., concurring).

At step one of the *McDonnell Douglas* burden-shifting analysis, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *see also Victor v. State*, 4 A.3d 126, 141 (N.J. 2010) ("the first step in that analysis

requires plaintiff to demonstrate that he or she can meet each of the elements of the prima facie case"). Here, the plaintiff's burden is rather modest. *Id.* However, the elements of the prima facie case vary based on the form of discrimination alleged. *Id.*

At step two, if the plaintiff establishes a prima facie case, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Stouch v. Twp. of Irvington*, 354 F. App'x 660, 666 (3d Cir. 2009). "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). However, at this stage, the employer does not have to prove that the "articulated reason actually motivated the action;" rather, "[t]he proffered reason need only raise a genuine issue of fact as to whether the employer acted impermissibly." *Shellenberger v. Summit Bancorp*, 318 F.3d 183, 189 (3d Cir. 2003).

Finally, at step three, if the employer articulates a non-discriminatory basis for the adverse employment action, the burden shifts back to the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton*, 707 F.3d at 426. "To make a showing of pretext, 'the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* at 427 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). As such, to survive summary judgment, the plaintiff must either "present sufficient evidence to meaningfully throw into question" the employer's proffered reasons or "come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor

more likely than not was a motivating or determinative cause of the adverse employment decision." *Fuentes*, 32 F.3d at 765.

Against this legal framework, the Court applies the *McDonnell Douglas* burden shifting analysis to each of Plaintiff's LAD claims.

*2. Age Discrimination*

In Count I, Plaintiff alleges that Computer Sciences violated LAD by firing him based on his age. Computer Sciences seeks summary judgment dismissal of this claim since Plaintiff fails under each step of the *McDonnell Douglas* framework.

At step one, it is Plaintiff's initial burden to establish a prima facie case of age discrimination. To assert a prima facie case of employment discrimination, Plaintiff must show "(1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position." *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *see also Clowes v. Terminix Int'l, Inc.*, 538 A.2d 794, 805 (N.J. 1988). To give rise to an inference of age discrimination, the plaintiff must show that he "was ultimately replaced by another employee who was sufficiently younger." *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).

Here, neither party disputes that Plaintiff satisfies the first three elements: (1) at 68 years old, he is a member of a protected class under LAD; (2) he was qualified as a CRE; and (3) he was ultimately terminated from his employment. However, Computer Sciences argues that Plaintiff, at step one, fails to allege any facts that give rise to an inference of age discrimination. The Court disagrees. The record shows that just two months prior to Plaintiff's termination, Computer

Sciences hired Westervelt, who is 14 years younger than Plaintiff, as a CRE. Moreover, once Plaintiff was fired, Westervelt was assigned New Logo accounts similar to the accounts Plaintiff was assigned. As such, at this stage, the Court is satisfied that Plaintiff has established a prima facie claim of age discrimination.

At step two, Computer Sciences contends that it has articulated a legitimate basis for firing Plaintiff, due to his poor work performance. LAD does not prohibit employers from discriminating against individuals "on the basis of competence, performance, conduct or any other reasonable standards." N.J.S.A. § 10:5-2.1. Here, Computer Sciences argues that Plaintiff was not fired based on his age, but due to his poor work performance. According to Computer Sciences, Plaintiff was a part of the UBS account team, which historically underperformed; moreover, after being reassigned to new accounts, Plaintiff fell woefully short of achieving his assigned quotas, which was addressed at his mid-year review. As such, the Court is satisfied that Plaintiff's poor performance constituted a legitimate basis for justifying Plaintiff's termination. *See, e.g., Hunter v. Rowan Univ.*, 299 F. App'x 190, 195 (3d Cir. 2008) (poor performance is a legitimate basis for adverse action); *see also Finn v. J.B. Hunt Transp. Servs.*, No. 07-4851, 2009 U.S. Dist. LEXIS 58044, at *14 (D.N.J. July 7, 2009) (same).

Finally, at step three, the Court finds that poor performance was a pretext for age discrimination. As noted above, at this stage, it is again Plaintiff's burden to cast doubt on the Computer Sciences' articulated reason for termination. *See Burton*, 707 F.3d at 427. First, prior to the November 2014 meeting with Warkentin, Plaintiff had never received any negative performance reviews and, instead, routinely exceeded expectations. While an "employees assertions of his own good performance" are insufficient to survive summary judgment, the Third Circuit has also held that:

> Where, as here, [the plaintiff] asserts not only that he performed well but that he never received any unfavorable criticism that his performance was poor or inadequate, the jury could conclude that [the employer's] failure to fault [the plaintiff's] performance for the twenty years prior to the negotiations leading to his discharge makes suspect its post hoc assertions of poor performance. This is especially true when [the employer] has failed to produce any other evidence of poor performance or make specific allegations of [the plaintiff's] deficiencies.

*Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995). Here, just two months before Plaintiff's termination, he was warned, for the first time, that his recent performance had failed to meet Computer Science's expectations. However, as Plaintiff points out, the reason for this drop in performance was due to his recent reassignment to strictly new logo accounts and unrealistic quota goals. The pretextual basis for his termination becomes even more apparent when considering the fact that he was not only assigned almost twice as many new logo accounts as any other CRE, all of whom were younger than him, but he also had his Sales Quota triple during that same timeframe. As such, when viewing the record in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff was fired because of his age, not poor performance. Therefore, Defendants' motion for summary judgment dismissal of Count I is denied.

*3. Disability Discrimination*

In Count II, Plaintiff alleges that he was fired based on his disability, contrary to LAD. As discussed above, the Court applies the *McDonnell Douglas* framework to this claim.

To establish a prima facie case of disability discrimination, the plaintiff must demonstrate: "(1) that he is a member of a protected class; (2) that he was otherwise qualified and performing the essential functions of the job; (3) that he was terminated; and (4) that the employer thereafter sought similarly qualified individuals for the job who were not members of his protected class." *Joseph N.J. Transit Rail Operations Inc.*, 586 F. App'x 890, 892 (3d Cir. 2014). Unlike other discrimination claims, a disability discrimination claimant must demonstrate, under the first

element, "that he or she qualifies as an individual with a disability, or who is perceived as having a disability, as that has been defined by statute." *Victor*, 4 A.3d at 142.

At step one of *McDonnell Douglas*, Computer Sciences argues that Plaintiff fails to state a prima facie claim of disability discrimination, since he does not qualify as an individual with a disability. LAD defines "disability" as, "physical or sensory disability, infirmity, malformation, or disfigurement which is caused by bodily injury, birth defect, or illness . . . which prevents the typical exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." N.J.S.A. § 10:5-5. Although not explicitly enumerated, New Jersey courts have recognized that a disability *arising from* a heart attack falls within the meaning of N.J.S.A. 10:5-4.1. *See Sarnowski v. Air Brooke Limousine*, 510 F.3d 398, 404 n.2 (3d Cir. 2007); *see also Panettieri v. C.V. Hill Refrigeration*, 388 A.2d 630, 634 (N.J. Super. Ct. App. Div. 1978). Although neither party disputes the fact that Plaintiff suffered a heart attack in January 2014, the Court finds fatal to Plaintiff's disability discrimination claim the fact that he fails to identify any *disability* that resulted from the heart attack.

The Court notes that *Sarnowski*, 510 F.3d at 404, which Plaintiff cites, is factually distinguishable. In *Sarnowski*, the plaintiff worked as a service manager for a limousine and charter bus service company, and was responsible for the maintenance of the vehicles. *Id.* at 401. During his employment, the plaintiff suffered from coronary heart disease and, in October 2002, underwent quintuple coronary artery bypass surgery. *Id.* Two months later, December 2002, Plaintiff received a written warning based on poor performance and was urged to improve his work. *Id.* Nevertheless, in April 2003, the plaintiff began experiencing heart palpitations and a coronary angiogram revealed that he had four more blocked arteries; the plaintiff was advised to

wear a heart monitor and that he may need to take an additional six weeks off for another heart surgery. *Id.* After informing his employers of these recent health issues, the plaintiff was fired. *Id.* In dismissing the plaintiff's LAD disability discrimination claims, the district court held that plaintiff could not demonstrate that he was disabled, since he did not present expert medical evidence. *Id.* at 403-04.

In reversing the district court's decision, the Third Circuit held that a plaintiff need not present expert testimony of a disability, but only "'competent and legal evidence' to support the diagnosis of a disability." *Id.* at 404 (citing *Clowes*, 538 A.2d at 806). Under this standard, the court found sufficient evidence to create a material issue as to whether the plaintiff suffered a disability under LAD. *Id.* Specifically, the court found the following record evidence noteworthy: "records from [the plaintiff's] treating doctors that catalogued his diagnoses with Coronary Artery Disease and Wolff-Parkinson-White syndrome, his October 2002 bypass surgery, specific findings by his heart surgeons, and the installation of an intracardiac defibrillator in his chest at the end of April 2003." *Id.* Here, however, there is no competent evidence presented for the Court to find that Plaintiff has suffered a disability as a result of the heart attack. In his own deposition, Plaintiff conceded that he did not suffer any conditions that prevented him from exercise, or that he ever applied for disability benefits. (ECF No. 34-3, "Plaintiff's Deposition" at 326-27). As such, even when viewing the record in Plaintiff's favor, he fails to establish that he suffered a disability, let alone that he was fired because of it.

Nevertheless, even if Plaintiff could satisfy the first step under *McDonnell Douglas*, as discussed above the Court is satisfied that, at step two, Computer Sciences presents a legitimate nondiscriminatory basis for terminating Plaintiff based on poor performance. Turning to step three, Plaintiff fails to present any competent evidence that suggests that his termination was a pretext

for discriminating against him based on his disability. Simply put, the record is bereft of any facts suggesting that Plaintiff's heart attack played any role in Computer Sciences' decision to fire him. As such, summary judgment is granted as to Count II.

*4. Retaliation*

In Count VI, Plaintiff claims that Computer Sciences wrongfully retaliated against him for complaining about his age and disability, contrary to LAD.

To state a prima facie retaliation claim under LAD, plaintiff must demonstrate that: "(1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence." *Victor*, 4 A.3d at 141. Like age and disability discrimination claims, "[r]etaliation claims under the NJLAD are analyzed under the *McDonnell Douglas* burden-shifting framework." *Bertolotti v. AutoZone, Inc.*, 132 F. Supp. 3d 590, 605 (D.N.J. 2015).

At step one of *McDonnell Douglas*, Computer Sciences again argues that Plaintiff fails to state a prima facie retaliation claim under LAD. Here, neither party disputes that Plaintiff satisfies the first three elements. However, Computer Sciences contends that Plaintiff fails to allege a causal link between his December 2014 grievance with the ER Department, wherein he alleged age and disability discrimination, and his February 2015 termination. Plaintiff argues that given the temporal proximity between his protected activity and his termination demonstrates the fourth factor, causal connection. At this step, when viewing the evidence in Plaintiff's favor, the Court is satisfied that Plaintiff has stated a claim of retaliation. *See Bertolotti*, 132 F. Supp. 3d at 606 ("The close temporal proximity qualifies as unusually suggestive timing and is evidence of a causal

connection between Plaintiff's request' and the change in her employment." (internal quotation marks and citations omitted)).

Having determined that Plaintiff states a prima facie claim of retaliation, the Court next considers whether Computer Sciences articulates a legitimate non-discriminatory basis for his termination. Here, as with Counts I and II, Computer Sciences contends that Plaintiff's termination was not based on his grievance, but his poor performance. In support of this assertion, Computer Sciences notes that, prior to his grievance with the ER Department, Plaintiff had already been put on notice of his poor performance and risk of being fired. The Third Circuit recently explained, "[a]n employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity." *Ward v. Ingersoll-Rand Co.*, 688 F. App'x 104, 110 (3d Cir. 2017) (quoting *Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014)).

Finally, at step three, the Court is satisfied that there is sufficient evidence in the record that a juror could reasonably find that poor performance was pretextual. Significantly, given that Warkentin sought permission to fire Plaintiff just a week after Plaintiff submitted his grievance, and two weeks before the end of the third quarter of FY 2015, a reasonable fact finder could conclude that Plaintiff's termination was done in retaliation for Plaintiff having filed his grievance. As such, summary judgment is denied as to Count VI.

*5. Aiding and Abetting*

In Count III, Plaintiff seeks to hold Warkentin individually liable for aiding and abetting Computer Sciences to fire Plaintiff due to his age, disability, and filing his grievance.

LAD prohibits "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act." N.J.S.A. § 10:5-12(e).

17

"[I]n order to hold an employee liable as an aider or abettor, a plaintiff must show that '(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.'" *Tarr v. Ciasulli*, 853 A.2d 921, 929 (N.J. 2004) (quoting *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999)). In determining whether Warkentin provided "assistance," courts should consider several factors: "(1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time of the asserted harassment, (4) the supervisor's relations to the others, and (5) the state of mind of the supervisor." *Id.* (citing *Restatement (Second) of Torts* § 876(b) comment d (1979)).

Here, the Court is satisfied that the record supports Plaintiff's aiding and abetting claim. First, as discussed above, Plaintiff has sufficiently demonstrated that he was fired due to his age and filing his grievance. Second, and more importantly, the record reflects that Warkentin played a prominent role in Plaintiff's termination. He was responsible for reassigning Plaintiff to the New Logo accounts, and was the one who criticized his recent performance. Moreover, just a week after Plaintiff filed his retaliation claim, Warkentin sought permission to have Plaintiff fired. As such, when considering the record in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Warkentin played as substantial role in having Plaintiff fired due to his age and grievance. As such, summary judgment as to Count III is denied.

## II. Breach of Contract Claims

### 1. Breach of Contract

In Count IV, Plaintiff alleges that Computer Sciences breached their contract with Plaintiff by failing to pay him the Million Dollar Challenge incentive. "To prevail on a breach of contract

claim, a party must prove a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and the breach caused the claimant to sustained damages." *EnviroFinance Group, LLC v. Envtl. Barrier Co., LLC*, 113 A.3d 775, 787, (N.J. Super. Ct. App. Div. 2015). Computer Sciences argues that the Million Dollar Challenge email is an invalid contract since it is insufficiently definite. The Million Dollar Challenge email states in its entirety:

> 3. The Million Dollar Challenge and Software License Incentive – New SPIFFs for Coverage
>
> Effective August 22, coverage professionals in all industries and regions are eligible for the following incentives (SPIFFs):
>
>> Coverage professionals in all industries and regions who achieve $1M in FY14 revenue above the full-year forecast submitted this month for their account(s) are eligible for the Million Dollar Challenge incentive:
>>
>> - $15,000 paid to coverage professional for first $1M incremental revenue.
>> - Additional payment of 1.5% for every additional $1 above the initial $1M.
>> - Incremental revenue is defined as FY14 revenue above the 4-8 forecast, which includes actuals through fiscal period 4 and forecast from fiscal period 4 to fiscal period 12.
>> - Budgeted Currency Exchange Rate (BD) is used to calculate incremental revenue achievement.
>> - Incentive will be calculated and paid at the end of FY14.
>> - CSC will fund an offsite for manager of the team with highest incremental revenue results.
>> - Managers of sales teams are not eligible for this incentive.
>> - AGMs, AMs & CRPs are eligible for accounts where a forecast is currently in place.

(ECF No. 34-24, "Million Dollar Challenge Email"). Here, the Court understands the Million Dollar Challenge email to constitute a unilateral contract, which "involve[s] only one promise and [is] formed when one party makes a promise in exchange for the other party's act or performance." *Giant Eagle, Inc. v. Comm'r*, 822 F.3d 666, 673 (3d Cir. 2016). To be enforceable, the contract

"must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 285 (N.J. 1992) (citation omitted). "Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Id.* "An essential characteristic of an enforceable contract is that its obligations be specifically described in order to enable a court or a trier of fact to ascertain what it was the promissor undertook to do." *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank*, 395 A.2d 222, 227 (N.J. Super. Ct. App. Div. 1978).

Computer Sciences does not contest the fact that Plaintiff, as a CRE, was eligible to participate in the Million Dollar Challenge, or that his UBS account's generation of $11.62 million made him eligible for the bonus. Instead, Computer Sciences argues that the terms of the Million Dollar Challenge were too ambiguous to be deemed enforceable. Specifically, Computer Sciences contends that because the Million Dollar Challenge email does not specify which accounts made a "coverage professional" eligible, nor did it define key terms such as "revenue," "achieve," and "eligible," it lacks essential terms to render the contract enforceable. "Essential terms are those that the parties would reasonably regard as vitally important elements of their bargain, an inquiry that depends primarily on the intent of the parties." *Rauch v. Rauch,* No. A-4745-14T4, 2017 N.J. Super. Unpub. LEXIS 2177, at *15 (N.J. Super. Ct. App. Div. Aug. 30, 2017) (quoting *McCoy v. Alden Indus.*, 469 S.W.3d 716, 725 (Tex. Ct. App. 2015)). Moreover, in New Jersey, "where there is ambiguity, the words are construed against the drafter." *In re Cmty. Med. Ctr.*, 623 F.2d 864, 866 (3d Cir. 1980).

Here, the Court is satisfied that the terms of the Million Dollar Challenge email are sufficiently defined, rendering it enforceable. The Million Dollar Challenge email sets forth: (1) when the incentive becomes effective; (2) who was eligible to participate; (3) which accounts are

covered under the program; (3) how much revenue must be generated; and (4) how the bonus will be calculated. Simply put, the Court finds that the Million Dollar Challenge is not "[a] contract so vague in the description of the performance of each party thereto [that it] is incapable of remedy at law or in equity." *Malaker Corp.*, 395 A.2d at 227. Computer Sciences ambiguity argument is further undermined by the fact that it recognized that Plaintiff was entitled to the incentive, yet chose to deny the bonus not because it was ambiguous, but because the UBS account had historically underperformed. The Court also notes that another federal court analyzed this Million Dollar Challenge and came to the same conclusion that it is an enforceable unilateral contract. *See Poage v. Computer Scis. Corp.*, No. 14-2602, 2015 U.S. Dist. LEXIS 167545, at *5-13 (D. Ariz. Dec. 14, 2015).

Lastly, Computer Sciences' argument that, under the Incentive Plan, they reserved discretion to distribute bonuses is without merit. Nowhere in the Incentive Plan does it say that it covers any other incentive program beyond those discussed therein, which did not include the Million Dollar Challenge. Nor does the Million Dollar Challenge email mention that it is subject to the Incentive Plan terms and conditions.

To sum up, the Court finds that the Million Dollar Challenge email constituted an enforceable unilateral contract between Computer Sciences' and Plaintiff. Computer Sciences promised a bonus to employees, such as Plaintiff, who generated revenue beyond normal forecasts and Plaintiff accomplished that goal. Therefore, Plaintiff is entitled to compensation for his performance.

*2. Breach of the Duty of Good Faith and Fair Dealing*

In Count V, Plaintiff alleges that Computer Sciences breached their duty of good faith and fair dealing, since they refused to recognize their obligation, under the Million Dollar Challenge incentive, to pay Plaintiff.

Under New Jersey law, every contract contains an implied covenant of good faith and fair dealing. *Sons of Thunder v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997). "In every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'" *Id.* (citation omitted). "In order to state a claim for breach of the implied covenant, a plaintiff must allege that: (1) a contract exists between the plaintiff and the defendant; (2) the plaintiff performed under the terms of the contract [unless excused]; (3) the defendant engaged in conduct, apart from its contractual obligations, without good faith and for the purpose of depriving the plaintiff of the rights and benefits under the contract; and (4) the defendant's conduct caused the plaintiff to suffer injury, damage, loss or harm." *TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC*, No. 12-3355, 2014 U.S. Dist. LEXIS 107756, at *7 (D.N.J. Aug. 5, 2014) (citing *Wade v. Kessler Inst.*, 778 A.2d 580, 586 (N.J. Super. Ct. App. Div. 2001)). In order to demonstrate that a defendant has breached this covenant, the plaintiff must demonstrate "that a defendant has acted with bad motive or intention." *Cargill Global Trading*, 706 F. Supp. 2d 563, 580 (D.N.J. 2010). "A plaintiff must 'provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Id.* (quoting 23 Richard A. Lord, Williston on Contracts § 63:22 at 513-14 (4th ed. 2009)).

Here, when reviewing the record in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Computer Sciences breached their duty of good faith and fair dealing. As discussed above, the Million Dollar Challenge constituted an enforceable unilateral

contract, to which Plaintiff was entitled to compensation. Despite satisfying the necessary terms to receive the incentive, Computer Sciences "pulled the rug out" from underneath Plaintiff, by declining to award any CRE assigned to the UBS account the bonus. As such, whether Computer Sciences acted in bad faith in denying the Million Dollar Challenge is a material issue of fact best suited to be resolved at trial. Therefore, Count V survives summary judgment.

### ORDER

Having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented, and for good cause shown, and for all of the foregoing reasons,

IT IS on this 2nd day of April, 2018,

ORDERED that Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part as follows:

(1) Count I (Age Discrimination) is DENIED

(2) Count II (Disability Discrimination) is GRANTED

(3) Count III (Aiding and Abetting) is DENIED

(4) Count IV (Breach of Contract) is DENIED

(5) Count V (Breach of the Covenant of Good Faith and Fair Dealing) is DENIED

(6) Count VI (Retaliation) is DENIED

PETER G. SHERIDAN, U.S.D.J.