McMORAN, O'CONNOR, BRAMLEY, & BURNS, P.C.
Ramshorn Executive Centre
Bldg. D, Suite D-1
2399 Highway 34
Manasquan, New Jersey 08736
(732) 223-7711
Attorneys for Plaintiff,
John Petronzi

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JOHN PETRONZI,

       Plaintiff,

          vs.

COMPUTER SCIENCES CORPORATION,
SCOTT WARKENTIN and DXC
TECHNOLOGY COMPANY,

       Defendants.

Docket No. 03:15-cv-03593-PGS-TJB

**FIRST AMENDED COMPLAINT
AND JURY DEMAND**

Plaintiff JOHN PETRONZI, by way of Complaint against Defendants, says:

### NATURE OF THE CASE

1.   This case is being brought pursuant to the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et. seq. alleging age and disability discrimination against Plaintiff and also alleging breach of contract and breach of the covenant of good faith and fair dealing.

### JURISDICTION AND VENUE

2.   The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. §1332(a) due to diversity of citizenship.

1

3.   The amount in controversy exceeds $75,000, exclusive of interest and costs.

4.   Venue in this district is proper under 28 U.S.C. §1391(b) because at all relevant times Plaintiff lived in New Jersey and a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

### THE PARTIES[1]

5.   At all times relevant to this action, plaintiff John Petronzi (hereinafter "Plaintiff") was a citizen and resident of New Jersey and a former employee of defendant Computer Sciences Corporation.

6.   Defendant Computer Sciences Corporation (hereinafter "CSC") is a Nevada corporation with a principal place of business at 3170 Fairview Park Drive, Falls Church, Virginia, 22042. CSC is a global provider of information technology and professional services and solutions.

7.   CSC does business throughout the State of New Jersey.

8.   On or about April 1, 2017, CSC and Hewlett Packard Enterprises merged to form DXC Technology Company.

9.   Defendant DXC Technology Company ("DXC") is a Nevada corporation with a principal place of business at 3170 Fairview Park Drive, Falls Church, Virginia, 22042.

---

[1] This Complaint does not contain a complete statement of the facts and shall not be deemed to waive, release, or otherwise relinquish any rights, remedies, or claims, all of which are expressly reserved.

10.  CSC is now a wholly owned subsidiary of DXC.

11.  Upon information and belief, the assets of CSC were transferred to DXC.

12.  Upon information and belief, DXC had notice of this pending lawsuit prior to acquiring the assets of CSC.

13.  There has been a substantial continuity of business operations between CSC and DXC.

14.  DXC operates out of the same principal place of business as CSC.

15.  DXC uses the same or substantially the same work force and supervisory personnel as CSC.

16.  DXC is liable for CSC's unlawful and discriminatory conduct towards Plaintiff as a successor in interest.

17.  Defendant Scott Warkentin (hereinafter "Warkentin") is a citizen and resident of Connecticut. At all relevant times, Warkentin was employed by CSC as the Divisional Industry General Manager for Banking and Capital Markets.

18.  Warkentin was Plaintiff's supervisor at CSC and was directly involved in the decision to terminate Plaintiff's employment with CSC.

### PLAINTIFF'S EMPLOYMENT WITH CSC

19.  Plaintiff is currently sixty-eight (68) years of age.

20.   Plaintiff was employed by CSC for over 7 ½ years, most recently as a Client Relationship Executive (CRE) in the Americas, Banking and Capital Markets group.

21.   Plaintiff was recruited to join CSC in July 2007 to manage its relationship with Washington Mutual. After Washington Mutual's implosion in 2008, Plaintiff was assigned to develop an account with Citigroup and to turn around CSC's relationship with Dun & Bradstreet.

22.   In 2009, Plaintiff was assigned to work on a large RFP response for UBS to manage their global networks. He was again highly successful. In June 2010, as a direct result of Plaintiff's efforts, CSC signed a $569 million global managed network services contract with UBS. Plaintiff became the CRE on the UBS account with primary responsibility for growing CSC's business relationships with UBS.

23.   The work that Plaintiff did on the UBS account in FY14 was particularly noteworthy. The target set by CSC on the UBS account for FY14 was approximately $136.6 million in revenue. This was considered a stretch target that exceeded any prior years' performance. Plaintiff and his colleagues on the UBS account far exceeded the target. The actual revenue generated from the UBS account in FY14 was $152.52 million, or $15.92 million above target.

24. Based on Plaintiff's record of success, CSC assigned him two additional accounts: Credit Suisse globally and RBS Citizens Bank in the Americas. Credit Suisse had no existing relationship with CSC and RBS Citizens Bank had only a small relationship that generated just over $2 million in revenue. Plaintiff was responsible for developing these accounts in addition to performing his duties for UBS, which he successfully did through FY14.

25. Plaintiff's job performance met or exceeded expectations at all times.

26. Prior to November 21, 2014, CSC had never warned Plaintiff orally or in writing that there were any concerns with his performance or behavior. To the contrary, all of the performance reviews that he received were positive, including a Valued Performer rating in FY12 and Meets Expectations ratings in both FY13 and FY14.

27. Plaintiff received his FY14 review from his then supervisor, John Wallace at the end of May 2014. He met or exceeded expectations in every category in the FY14 review according to CSC.

### CSC FABRICATED CONCERNS WITH PLAINTIFF'S PERFORMANCE

28. In January 2014, Plaintiff turned age sixty-five (65) and suffered a heart attack.

29. CSC was fully aware of Plaintiff's medical condition.

5

30.   Remarkably, Plaintiff returned to work at CSC in only one (1) week.

31.   Following Plaintiff's heart attack, CSC removed him as the CRE on the UBS account.

32.   Plaintiff's job duties on the UBS account were assumed by a considerably younger employee.

33.   In April 2014, only months after Plaintiff suffered a heart attack, John Wallace informed Plaintiff that he was going to be assigned five (5) new accounts. He was expected to develop these new accounts from scratch as none of them had any existing business relationship with CSC.

34.   On May 2, 2014, CSC gave Plaintiff formal notification of his new, accounts. He was given a quota on the accounts of $12 million in sales (TCV) and $5.5 million in revenue.

35.   In August 2014, Plaintiff was transferred to a new supervisor, Scott Warkentin, who is approximately ten to twelve years younger than Plaintiff.

36.   Almost immediately, Warkentin changed Plaintiff's account assignments. It was the second time in less than five (5) months that CSC had made such a change.

37.   Warkentin handed Plaintiff the almost impossible task of developing approximately seventy (70) new accounts, called "new logo" accounts, spread-out over the entire country. Almost

none of the new logo accounts had any existing business relationship with CSC.

38.   On November 21, 2014, less than three (3) months after taking over as Plaintiff's supervisor, Warkentin presented Plaintiff with his mid-year performance review for FY15.

39.   Warkentin informed Plaintiff that his pipeline and sales performance on the seventy (70) new logo accounts he had been assigned only three (3) months earlier were allegedly in the lowest quartile of the group. Warkentin threatened that if Plaintiff did not show improvement by the end of December 2014, he would be terminated. It was the first and only bad review that Plaintiff ever received at CSC.

40.   Warkentin also informed Plaintiff on November 21 that his TCV quota for FY15 had been tripled from $12 million to $36 million, retroactive to the beginning of FY15. It was the first time Plaintiff was informed of this change.

41.   Five (5) days later, on November 26, 2014, Warkentin sent Plaintiff an e-mail as a "follow-up to [his] mid-year/territory review." The e-mail gace Plaintiff until December 31, 2014 to improve or he would be fired.

42.   On December 4, 2014, Plaintiff submitted a response to Warkentin's November 26 e-mail pointing-out multiple inaccuracies in the mid-year review and how unrealistic

7

Warkentin's goals for Plaintiff were. Among other things,

Plaintiff stated:

> As you are aware, I was very surprised by
> our conversation on November 21, 2014 at the
> end of my mid-year review. I take your
> comments about my alleged lack of
> performance and your subsequent e-mail of
> November 26, 2014 very seriously. The
> Company has never before expressed any
> concern with any aspect of my job
> performance in the 7 ½ years I have worked
> for CSC. All of my prior performance reviews
> have been positive, including a Valued
> Performer rating in FY12 and Meets
> Expectations ratings in both FY13 and FY14.
>
> I received my FY14 review from John Wallace
> only six (6) months ago at the end of May
> 2014. I met or exceeded expectations in
> every category on that review according to
> John.
>
> Given my prior reviews, and for the reasons
> set forth below, it appears that CSC is
> looking for reasons to try to force me out
> of the Company. I am deeply troubled by
> this, particularly since it comes on the
> heels of me turning age 65 in January 2014
> and recovering from a heart attack. I am the
> oldest CRE in the Americas B & CM group and
> believe that the Company is trying to
> squeeze me out because of my age and/or
> health to make room for younger employees.

43. In a span of approximately six (6) months from the

time Plaintiff received his FY14 review in May 2014 until his

FY15 mid-year review on November 21, 2014, Plaintiff's

performance allegedly went from meeting or exceeding

expectations in every category (in the FY14 review) to being so

poor that he was given a month to improve or he would be

terminated. This is not believable. Plaintiff did not suddenly forget how to do his job in six (6) months.

44. Plaintiff was the oldest CRE in the Americas, Banking and Capital Markets group reporting to Warkentin. That fact, coupled with the heart attack Plaintiff suffered in January 2014, was the real reason CSC so drastically changed its opinion of Plaintiff's performance in such a short period of time. Plaintiff complained about such discrimination in his December 4 e-mail to Mr. Warkentin.

THE MILLION DOLLAR CHALLENGE

45. Included in Plaintiff's December 4, 2014 e-mail to Warkentin was a complaint about CSC's failure to pay him for the Million Dollar Challenge.

46. The Million Dollar Challenge was a special incentive program announced by CSC on August 22, 2013.

47. Under the program, "[c]overage professionals in all industries and regions who achieve $1M in FY14 revenue above the full year forecast submitted this month for their account(s) are eligible for the Million Dollar Challenge incentive," which included "$15,000 paid to coverage professionals for the first $1M incremental revenue" and an "[a]dditional payment of 1.5% for every additional $1 above $1M."

48. The Million Dollar Challenge was a unilateral compensation contract, which Plaintiff and others accepted by their performance.

49.  Plaintiff is entitled to a Million Dollar Challenge incentive payment based on the performance of the UBS account in FY14.

50.  The target set by CSC on the UBS account for FY14 was $136.6 million in revenue. At the time the Million Dollar Challenge was announced in August 2013, the full year forecast for revenue at UBS was $140.9 million. Actual revenue on the UBS account in FY14 was $152.5 million, or an improvement of over $10 million.

51.  Therefore, Plaintiff is entitled to a Million Dollar Challenge incentive payment of approximately $150,000, which CSC has failed and/or refused to pay.

52.  CSC never provided Plaintiff with an accounting of the associated performance under the Million Dollar Challenge, nor a reason for not paying the compensation due.

### CSC UNLAWFULLY TERMINATED PLAINTIFF

53.  On December 5, 2014, Plaintiff sent a copy of his December 4, 2014 e-mail to Warkentin to Ira A. Katz (hereinafter "Katz"), Senior Professional Employee Relations at CSC, stating "[p]lease accept the e-mail chain below as a grievance …"

54.  Plaintiff's submission of this grievance constituted a protected activity that entitled him to protection from retaliation under section 10:5-12(d) of the New Jersey Law Against Discrimination, which makes it unlawful "[f]or any person to take reprisals against any person because that person

has opposed any practices or acts forbidden under this act," e.g., age and/or disability discrimination.

55. Employee Relations purportedly investigated Plaintiff's allegations of age and disability discrimination and found them to be without merit.

56. Employee Relations also allegedly investigated CSC's failure to make the Million Dollar Challenge payout, but provided no answer to Plaintiff on why he had not been paid.

57. Plaintiff was informed of Employee Relations' findings on February 2, 2015.

58. The next day, February 3, 2015, only two (2) two months after Plaintiff submitted his complaint of workplace discrimination, eight (8) months after he received his FY14 review in which he met or exceeded expectations in every category, and only one year after he turned age sixty-five (65) and suffered a heart attack, Katz informed Plaintiff that Warkentin had made the decision to terminate Plaintiff's employment with CSC effective February 17, 2015 for allegedly poor performance.

59. Defendants' alleged termination reason (poor performance) is false and is a pretext for the real reason Plaintiff was fired: his age and/or disability.

60. Following the termination of Plaintiff's employment, his job duties and accounts were assigned by CSC to younger employees.

61.  Defendants' decision to terminate Plaintiff's employment because of his age and/or disability was discriminatory in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

### PLAINTIFF'S DAMAGES

62.  Plaintiff has engaged in a diligent job search since the termination of his employment with CSC.

63.  Plaintiff has been unable to find comparable employment since the termination of his employment with CSC.

64.  Plaintiff has sustained and will continue to sustain significant economic losses as a result of the Defendants' unlawful conduct, including but not limited to, lost salary, lost options and grants, bonuses and medical benefits and the loss of the incentive bonus under the Million Dollar Challenge

65.  As a result of the Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer emotional distress, anxiety, pain and suffering, humiliation, career, family and social disruption and other grievous harm.

66.  The decision to terminate Plaintiff's employment with CSC was made by the Defendants with malice and/or willful indifference to the discrimination against Plaintiff and his rights and the consequences of his termination.

67.   The actions of Defendants were meant to cause, or caused in a gross or reckless manner, egregious and unjustified harm to Plaintiff.

68.   Upper management at CSC either approved or acted with willful indifference or reckless disregard to the unlawful discrimination against Plaintiff, so as to warrant punitive damages against the Defendants.

**COUNT ONE**

**(AGE DISCRIMINATION)**

69.   Plaintiff repeats the allegations of the prior paragraphs as if set forth herein.

70.   CSC was Plaintiff's "employer" within the meaning of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq.

71.   CSC terminated Plaintiff's employment because of his age in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq.

72.   Plaintiff has suffered damages as a result of CSC's unlawful conduct.

73.   DXC is liable for CSC's unlawful and discriminatory conduct towards Plaintiff as a successor in interest.

WHEREFORE, Plaintiff demands judgment against CSC and/or DXC: (a) awarding Plaintiff economic damages, including but not limited to, back pay, front pay, bonuses and all other

13

compensation and benefits to which Plaintiff is entitled; (b) awarding Plaintiff damages for all other compensatory damages, including any economic loss, physical and emotional distress, anxiety, humiliation, emotional harm, pain and suffering, career, family and social disruption and other grievous harm; (c) awarding Plaintiff punitive damages; (d) awarding Plaintiff attorney's fees, costs and disbursements; (e) awarding Plaintiff pre and post judgment interest; and (f) awarding Plaintiff such other relief as the Court deems equitable and just.

**COUNT TWO**

**(DISABILITY DISCRIMINATION)**

74. Plaintiff repeats the allegations of the prior paragraphs as if set forth herein.

75. Plaintiff's heart condition constitutes a disability within the meaning of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

76. Alternatively, Defendants perceived Plaintiff to be disabled as a result of his heart condition.

77. CSC terminated Plaintiff's employment because of his disability or perceived disability in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

78. Plaintiff has suffered damages as a result of CSC's unlawful conduct.

79.   DXC is liable for CSC's unlawful and discriminatory conduct towards Plaintiff as a successor in interest.

WHEREFORE, Plaintiff demands judgment against CSC and/or DXC: (a) awarding Plaintiff economic damages, including but not limited to, back pay, front pay, bonuses and all other compensation and benefits to which Plaintiff is entitled; (b) awarding Plaintiff damages for all other compensatory damages, including any economic loss, physical and emotional distress, anxiety, humiliation, emotional harm, pain and suffering, career, family and social disruption and other grievous harm; (c) awarding Plaintiff punitive damages; (d) awarding Plaintiff attorney's fees, costs and disbursements; (e) awarding Plaintiff pre and post judgment interest; and (f) awarding Plaintiff such other relief as the Court deems equitable and just.

### COUNT THREE

### (AIDING AND ABETTING)

80.   Plaintiff repeats the allegations of the prior paragraphs as if set forth herein.

81.   Warkentin participated in the unlawful discrimination described herein.

82.   The acts of Warkentin were committed within the scope of his employment with CSC and thus he is sued in both his individual and official capacities.

83.   Warkentin  aided   and   abetted   CSC   in   terminating Plaintiff's employment because of his age and/or disability in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq*.

84.   Plaintiff   has   suffered   damages   as   a   result   of Warkentin's unlawful conduct.

WHEREFORE,  Plaintiff  demands  judgment  against  Warkentin: (a)   awarding   Plaintiff   economic   damages,   including  but  not limited   to,  back  pay,  front  pay,  bonuses  and  all  other compensation and benefits to which Plaintiff is entitled; (b) awarding Plaintiff damages for all other compensatory damages, including  any  economic  loss,  physical  and  emotional  distress, anxiety,   humiliation,   emotional   harm,   pain   and   suffering, career,  family  and  social  disruption  and  other  grievous  harm; (c)  awarding  Plaintiff  punitive  damages;  (d)  awarding  Plaintiff attorney's fees, costs and disbursements; (e) awarding Plaintiff pre and post judgment interest; and (f) awarding Plaintiff such other relief as the Court deems equitable and just.

## COUNT FOUR

### (BREACH OF CONTRACT)

85.   Plaintiff   repeats   the   allegations   of   the   prior paragraphs as if set forth herein.

86. Plaintiff was eligible to receive incentive compensation under the Million Dollar Challenge program announced by CSC on August 22, 2013.

87. The Million Dollar Challenge program was a unilateral and binding compensation contract, which Plaintiff and others accepted by their performance.

88. Plaintiff is entitled to a Million Dollar Challenge incentive payment based on his performance and the performance of the UBS account in FY14.

89. The target set by CSC on the UBS account for FY14 was $136.6 million in revenue. At the time the Million Dollar Challenge was announced in August 2013, the full year forecast for revenue at UBS was $140.9 million. Actual revenue on the UBS account in FY14 was $152.5 million, or an improvement of over $10 million. Therefore, Plaintiff is entitled to a Million Dollar Challenge incentive payment of approximately $150,000.

90. CSC has breached its contract with Plaintiff by failing to pay Plaintiff the incentive bonus he is entitled to under the Million Dollar Challenge program.

91. Plaintiff has suffered damages as a result of CSC's unlawful conduct.

92. DXC is liable for CSC's unlawful conduct towards Plaintiff as a successor in interest.

WHEREFORE, Plaintiff demands judgment against CSC and/or DXC for compensatory damages, costs and such other relief as the Court deems equitable and just.

## COUNT FIVE

### (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

93. Plaintiff repeats the allegations of the prior paragraphs as if set forth herein.

94. CSC breached the covenant of good faith and fair dealing by failing to pay Plaintiff the incentive bonus he is entitled to under the Million Dollar Challenge program.

95. Plaintiff has suffered damages as a result of CSC's unlawful conduct.

96. DXC is liable for CSC's unlawful conduct towards Plaintiff as a successor in interest.

WHEREFORE, Plaintiff demands judgment against CSC and/or DXC for compensatory damages, attorney's fees, punitive damages, and such other relief as the Court deems equitable and just.

## COUNT SIX

### (NEW JESREY LAW AGAINST DISCRIMINATION)

97. Plaintiff repeats the allegations of the prior paragraphs as if set forth herein.

98. Defendants unlawfully retaliated against Plaintiff for complaining of age and/or disability discrimination in violation

18

of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12(d).

99. Defendants' retaliatory acts proximately caused Plaintiff personal hardships, including economic losses and pain, suffering and humiliation.

WHEREFORE, Plaintiff demands judgment against Defendants for economic damages, including but not limited to, back pay and front pay, compensatory damages, attorney's fees, punitive damages, pre and post judgment interest, and such other relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

## DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates Bruce P. McMoran, Esq. and Douglas S. Bramley Esq. as trial counsel.

## CERTIFICATION

I certify that the matter in controversy in the within action is not pending in any other court, or any pending arbitration or administrative proceeding, nor is any such court, arbitration or administrative proceeding presently contemplated. There are no other persons who should be joined at this time.

```
                        McMORAN, O'CONNOR BRAMLEY & BURNS, P.C.
                        Ramshorn Office Centre
                        Building D, Suite D-1
                        2399 Highway 34
                        Manasquan, New Jersey 08736
                        Attorneys for Plaintiff


                        By:  _____
                             DOUGLAS S. BRAMLEY


Dated:   November 13, 2018
```